**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Christopher LANIER, Defendant and Appellant.**

**No. 16592.**

Supreme Court of South Dakota.

Considered on Briefs Oct. 16, 1989.

Decided Feb. 28, 1990.

Frank Geaghan, Asst. Atty. Gen., for plaintiff and appellee, Roger A. Tellinghuisen, Atty. Gen., Pierre, on the brief.

Craig M. Johnson, Pennington County Public Defender's Office, Rapid City, for defendant and appellant.

MILLER, Justice.

In this appeal we affirm the trial court and hold that it is permissible for law enforcement officers to require, and to use reasonable force to obtain, a blood sample from a person arrested for third-offense driving while under the influence of alcohol or drugs.

## FACTS

On July 1, 1988, defendant/appellant Christopher Lanier was stopped in Rapid City, South Dakota, by State Trooper Jorgenson and his Training Officer Trooper Nelson. The troopers had probable cause to stop Lanier's vehicle. The troopers made the following observations: (1) Lanier had difficulty locating his driver's license; (2) there was an odor of alcohol; (3) his eyes were bloodshot; (4) his face was flushed; (5) his speech was slurred; and (6) he had a "slow, staggered walk."

Lanier was asked to perform field sobriety tests, but was unable to perform any of the tests to the satisfaction of the arresting officers. He was therefore placed under arrest for driving under the influence of an alcoholic beverage (DUI), a violation of SDCL 32-23-1. After making the arrest, Trooper Jorgenson contacted State Radio requesting a driver's history and learned Lanier had two prior DUI convictions.

Subsequent to arrest, Lanier was read the Implied Consent warning and then taken to the Pennington County Jail. At the jail, he was informed that blood would be drawn for testing purposes. Initially he did not respond, but when introduced to the medical technologist who would be drawing the blood, he became argumentative and

questioned the technologist's ability. The medical technologist showed Lanier his certification card. Lanier threw the card on the floor stating that he could get one of those in any bar and that he was not going to allow him to draw the blood. When the medical technologist attempted to draw the blood, Lanier resisted. It eventually took five or six officers to restrain Lanier while the blood was being drawn.[1] Analysis of the sample indicated that Lanier's blood alcohol content had been 0.14 percent.

## ISSUE

WHETHER THE TRIAL COURT ERRED IN DENYING LANIER'S MOTION TO SUPPRESS THE BLOOD TEST RESULTS.

## DECISION

The leading case which addressed the issue concerning nonconsensual blood tests is *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In *State v. Hartman*, 256 N.W.2d 131 (S.D. 1977), we adopted the *Schmerber* holding that bodily substance samples are not subject to the exclusionary rule under the Fourth Amendment if they are taken (1) incident to a lawful arrest, (2) by a reliable and accepted method of obtaining such sample, (3) in a reasonable, medically approved manner, and (4) where there is probable cause to believe that the evidence sought exists. We also noted and held that the elimination of alcohol by natural bodily functions presents exigent circumstances which obviate the necessity of obtaining a search warrant. *Hartman, supra* (citing *Schmerber, supra* ).

We have not had the opportunity to address this issue since the amendment of SDCL 32-23-10 [2] which now reads, in salient part:

---

1. After Lanier tried to kick one of the jail personnel, he was subdued with two people holding his legs, one restraining his body, two holding his hands or arms, and possibly one other assisting.

2. By 1988 Sess.L. ch. 265, SDCL 32-23-10 was amended to eliminate the right of a third offense DUI suspect to refuse a blood test, under the implied consent law.

Any person who operates any vehicle in this state is considered to have given his consent to the withdrawal of blood or other bodily substance and chemical analysis of his blood, breath or other bodily substance to determine the amount of alcohol in his blood, and to determine the presence of marijuana or any controlled drug or substance.

The person shall be requested by the officer to submit to the withdrawal of blood or other bodily substance for chemical analysis or chemical analysis of his breath and shall be advised by the officer that:

(1) If he refuses to submit to the withdrawal or chemical analysis, no withdrawal or chemical analysis may be required, *unless he has been arrested for a third violation of § 32–23–1, constituting a felony offense under § 32–23–4* [.] (Emphasis added.)

We have, however, recently upheld the amendment to the statute against a constitutional attack in *State v. Heinrich,* 449 N.W.2d 25 (S.D.1989).

The only applicable prong of the *Schmerber* analysis Lanier raises here is whether the withdrawal of the blood was obtained in a reasonable, medically approved manner, i.e., whether (1) it is appropriate to take the blood sample in jail rather than a hospital; and (2) the force used by the officers was reasonable under the circumstances.

■ Lanier attempts to distinguish this case from *Schmerber* because in *Schmerber,* the blood test had taken place in a hospital and in the present case in a jail. We find this distinction to be without merit. We interpret *Schmerber* and its progeny to hold that blood tests are not required to take place in a hospital but rather under conditions which provide a medically ap-

proved manner for the specific purpose of drawing blood. "Such tests are a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain." *Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836; *Winston v. Lee,* 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985). A crucial factor in analyzing the magnitude of the intrusion is the extent to which the procedure may threaten the safety or health of the individual. *Winston, supra.*

The blood withdrawal here was performed by a certified medical technologist who has been drawing blood for twenty-one years at a rate of 10–20 every five weeks of every year. We conclude that the manner in which the blood was drawn did not threaten the health, safety or life of Lanier. This was a simple, almost painless procedure which could be performed practically anywhere without danger to the patient.[3] Requiring the officers to go one step further by having the blood drawn in the hospital would serve no useful purpose but rather would increase the risk of loss of evidence of the alcohol content in the blood and further could endanger the safety of law enforcement officers by requiring additional, unnecessary contact with a prisoner. Under these facts, we conclude that the blood withdrawal was performed in a medically approved manner.[4]

■ We next address whether the force used by the law enforcement officers was within the contemplation of *Schmerber* and, if so, whether it was reasonable under the facts and circumstances of this case.

In *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), the Court noted that *Schmerber* clearly

---

**3.** In *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957), the Court concluded that a blood test taken by a skilled technician is not such conduct that shocks the conscience nor does it offend a sense of justice.

**4.** As I read it, the second part of the dissent expresses a concern over the transmission of communicable diseases through blood extraction in a jail. Initially, I observe that such issue

was not presented here and there was no assertion that the sanitary conditions in the jail were anything other than medically acceptable. Next, to suggest that the medical persons authorized under SDCL 32–23–14 to remove blood would perform their duties in any circumstance not medically acceptable so as to endanger public health, is unrealistic.

allows a state to "force" a person suspected of driving while under the influence to submit to a blood alcohol test by virtue of the Implied Consent laws. As previously mentioned, and as indicated by statute, South Dakota grants a person the right to refuse a blood test on the first and second arrests; however, third offenders lose that right. The issue becomes, by virtue of the state's power to force someone to take a blood test, whether "force" was meant to include "physical force." Few states have enacted laws which specifically allow law enforcement to use reasonable force in the removal of evidence in felony drunk driving cases.[5]

In *Hammer v. Gross*, 884 F.2d 1200, 1208 (9th Cir.1989), decided September 6, 1989, the Ninth Circuit, in a factual situation quite similar to that here, found no constitutional violations in the use of physical force in the removal of a blood sample, stating:

> We think that jurisprudence also validates the particular application of force to effectuate the search and seizure which occurred in this case.
>
> ... Although we, like the California Supreme Court, recognize that the forcible removal of a blood sample from a DUI suspect will virtually always be 'unpleasant, undignified and undesirable' People v. Superior Court (Hawkins) 6 Cal.3rd at 764, 100 Cal.Rptr. at 286, 493 P.2d at 1150, it will not always be—and was not in this case—unconstitutional.
>
> Because the amount of force applied was minimal, and did not exceed the amount necessary to effect the otherwise lawful search for and seizure of blood alcohol evidence which occurred in the circumstances of this case, we hold as a matter of law that (the officers') conduct was not 'unreasonable' within the meaning of the Fourth Amendment.

*See also Carlton v. Superior Court,* 170 Cal.App.3rd 1182, 216 Cal.Rptr. 890 (1985), and *People v. Ryan,* 116 Cal.App.3rd 168, 171 Cal.Rptr. 854, 14 A.L.R.4th 702 (1981).

Following what we believe to be the majority position, we hold that by virtue of the fact that the legislature has classified a third offense DUI as a felony, the exigent circumstances created by the elimination of alcohol by natural bodily functions and the compelling interests stated earlier, that the use of physical force is permissible to obtain virtually the only direct evidence available of proof of alcohol consumption; *however, we do not depart from the general rule that such force must be reasonable under the facts and circumstances of the individual case. Schmerber, supra; Hartman, supra; Hammer, supra.* We conclude that the force used here was not unreasonable.

Affirmed.

WUEST, C.J., and MORGAN and SABERS, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

I would countermand the order of the trial court, which denied Lanier's motion to suppress the results of his blood test, for the reasons set forth in this dissent and further believing that the far reaching effect of this decision is opposed to the principles upon which this Republic was founded, namely by expression in the United States Constitution. Accordingly, I dissent.

### STATUTE UNCONSTITUTIONAL.

In *State v. Heinrich*, 449 N.W.2d 25 (1989), this Court upheld the constitutionality of SDCL 32–23–10. In *Heinrich*, this author dissented upon the basis that the Doctrine of Separation of Powers was violated. In essence, it was my belief, as it is now, that a law enforcement official cannot make a determination that the person presently being arrested—was a person previously convicted of two DUI's. Radio calls from a records office is not a determination of two valid, prior convictions. This Court, in *State v. King*, 383 N.W.2d 854 (S.D. 1986), held that a constitutionally infirm conviction cannot be used to enhance a

---

**5.** Fla.Stat.Ann., § 316.1933(1) (1987); Haw.Rev. Stat., § 286–163 (1985); Md.Trnsp.Code Ann., § 16–205.1(c)(1) (Cum.Supp.1989); Nev.Rev. Stat., § 484.383(8) (1989).

sentence under this State's habitual offender statutes. Our first inquiry: Is a prior conviction constitutionally valid? Secondly, may same be used for purposes of enhancement in punishment? Executive officers cannot make determinations on the infirmity of prior convictions. This Court should, in the exercise of its judgment, relate its decision in the instant case to decisions that were made in the past. This is a rule of judicial exposition rather than justification. To my way of thinking, these questions can only be determined by courts of law and not by some officer out on the highway, in the black of the night, or the heat of the day. Valid previous convictions should/would be determined in a court of law, by a judge, under my thesis and the precedent of *King*.

It is my opinion that the statutory language employed against Lanier is used as a bootstrap to force him to give his blood because some officer is making a determination of "a felony offense under § 32-23-4." This is an unlawful mixture of the executive and judicial departments of government. This author believes that the statutory language is ill-conceived and is sought as a means to achieve a social result. The social result, however good and noble in the minds of the legislature, must meet constitutional muster. Hereby, I reaffirm my dissent in *Heinrich*. As to how an officer on the road can make a determination of the legal status of a person's prior record, beggars the imagination.

Additionally, I urge the following rationale as to why this statute is unconstitutional. In my opinion, the South Dakota Supreme Court has misapplied the holdings in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1967) and *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). This Court has previously held that, where the defendant has the right to refuse the blood-alcohol test, constitutional protections are thereby guaranteed. We have, before us, the current statute which eliminates the right of refusal for persons twice convicted of a violation of SDCL 32-23-1.

In my opinion, *Schmerber* and *Neville* do not support a holding that this statute is constitutional because there is a definite distinction between Art. V of the United States Constitution and Art. VI, § IX of the State Constitution of South Dakota. Said provision of the United States Constitution expresses, inter alia, "No person ... shall be compelled in any criminal case, to be a *witness* against himself...." Said state constitutional provision expresses, inter alia, "No person shall be compelled in any criminal case to give *evidence* against himself...." Therefore, to pass a law to require a South Dakota citizen to give evidence against himself (blood) through physical force is against our state constitution. Read the footnote found in the first *Neville* case on page 726. I refer to the first *Neville* case at 312 N.W.2d 723, 726 (S.D. 1981). Said footnote reveals that there is a distinction in the constitutional provisions of the federal and our state constitution. The United States Supreme Court recognized this distinction in *Neville*. *Schmerber* was decided in the backdrop of a more liberal definition of evidence, as used in our state constitution. Obviously, the *Schmerber* court was not, in 1966, considering this state's constitution. *Schmerber* arose from California. In the *Neville* footnote, this Court indicated that there was no need to draw a distinction "at this time" between the federal and state constitution.

In the second *Neville* case found at 346 N.W.2d 425 (S.D.1984) we addressed the distinction between these two constitutional provisions and found that a refusal is of a "testimonial nature," thus protected by the privilege against self-incrimination but, nonetheless, admissible as such a refusal is not the result of the compulsion prohibited by our state constitution. "It would require an uncommon portion of fortitude in the judges to do their duty as faithful guardians of the Constitution, where legislative invasions of it had been instigated by the major voice of the community." (Alexander Hamilton). I share no guilt for exercising the doctrine of judicial review. Often, a statute such as this is based upon political results at the polls but do clash with constitutional guarantees.

We should address this question: Does this statute compel submission to a blood test which violates the state constitution when it prohibits the compulsion of giving "evidence" against one's self? If one reads *Schmerber* carefully, it is noted that it states that the critical question was whether "petitioner was thus compelled *'to be a witness against himself'*." (Emphasis supplied mine). So this author believes that these distinctions, found in the two constitutional provisions, must now be addressed. This author notes, that in the second *Neville* case, this Court held the defendant was not compelled to give evidence against himself because *he had an option to submit to the blood test.* Suffice it to say, the option is now eradicated by state law via the Legislature. In *State v. Hoenscheid,* 374 N.W.2d 128 (S.D.1985) page 130, I will concede that this Court awkwardly placed weak and misguided language in its opinion. How so? Simply because we expressed that we had held that the proscription (in *Neville II* ), pertaining to the state constitutional provision, was no broader than the Fifth Amendment to the U.S. Constitution. A closer review of *Neville II* does not so hold. We therefore should now give a more meaningful expression of legal thought as to the word "evidence" as found in our state constitution. The time is ripe to interpret the distinction between these two constitutional provisions because the option has now been eliminated. Our holdings need clarification and I travel the liberal road on interpreting our state constitution to mean that forcefully taking blood, as if a man is in chains, is compelling him to give *evidence* against himself, which I deem is contrary to our state constitution. Not testimony, as such, but *evidence.*

Alas, alack, Lanier did not urge the unconstitutionality of SDCL 32–23–10. However, having the power of a somewhat limited recall, a case surfaced into the cobwebs of my mental/legal retention. *Bayer v. Johnson,* 349 N.W.2d 447, 449 (S.D. 1984), oozed from the murky depths of the limited recall. At page 449 thereof, this Court unanimously held: "There is good authority that where the appellate court has jurisdiction on other grounds it may decide a constitutional question on its own motion." *Bayer* cites with approval *City of St. Louis v. Butler Co.,* 358 Mo. 1221, 219 S.W.2d 372 (1949); 4 C.J.S. Appeal & Error § 240 (1957). Chief Justice Fosheim concluded, in *Bayer,* that "We would be less than supportive if we failed to meet that which is constitutionally offensive." Therefore, within the bosom of that decision and language, I again assert the unconstitutionality of this statute before us and would reverse the decision of the trial court which admitted into evidence the blood results of Lanier. Such a decision would be dispositive.

### NO EXIGENT CIRCUMSTANCES AND UNREASONABLE FORCE USED. THUS, BLOOD TAKING WAS CONSTITUTIONALLY OFFENSIVE.

However, realizing that my view is in the minority on the constitutionality of this statute, I treat—head on, the rationale of the majority opinion which essentially holds that the blood extracted from Lanier was vital because of "exigent circumstances" and that "use of physical force is permissible to obtain virtually the only direct evidence available of proof of alcoholic consumption". These quotes are taken from the majority opinion and are the only linchpin rationale inherent therein; it is the cement reasoning which affixes onto some golden oldies (cases) pertinent to the issue confronting us and other cited legal sources within the majority opinion. Without attacking the outside authority and past cases, I hone in on the "linchpin rationale" of this decision, i.e., the creative thinking which justifies a conclusion from an analysis. A leap of logic, one may term it.

Lanier could have been taken to a hospital. He was not. In *Schmerber,* the blood extraction took place in a hospital. There was no force used in *Schmerber.* Here, we have the blood extraction in a jail setting where six people, not including the medical technician, held Lanier down by pinning his arms, legs, shoulder and head. Therefore, the facts of this case are quite distinguishable from *Schmerber.* The arresting offi-

cer had already required Lanier to perform *five different sobriety tests!* This is "direct evidence" and, therefore, the majority's linchpin rationale and leap of logic, plummets. Additionally, the officer had observed his eyes (bloodshot), face (flushed) and gait (a slow staggered walk). Hence, physical evidence was available to prosecute Lanier.

There is a social interest in the general security of our citizens. People have a right to be secure from coercive law enforcement conduct, as well as all excesses of government, which threaten their existence and liberty. This is the essence of the Bill of Rights. The state had a plethora of evidence to convict. A social interest in general security of our citizens need not have been violated. I appreciate that there is a weighing of the social interest in the general security against other social interests. Drunken driving should not be countenanced. However, neither should excessive force of the executive branch be blessed by the judicial branch as a means to an end. Furthermore, Lanier could have been taken to a hospital. He was not. Jail settings are not conducive to sanitation and clean medical technology. In *Schmerber*, the United States Supreme Court expressed that the administration of blood tests are not entirely free of Fourth Amendment constraints. In fact, the *Schmerber* court most emphatically pointed out that the blood extraction "... involves virtually no risk" when withdrawn "... by a physician in a hospital environment according to accepted medical practices." 86 S.Ct. at 1834. At 1836, the *Schmerber* court warned law enforcement and the jurists of this nation that it would not tolerate "... more substantial intrusions, or intrusions under other conditions." It warned against, also, intrusions into the body which "... are made in an improper manner."

As a member of the judiciary, I have the right to use my experience and knowledge to draw upon the same that I would make good decisions. Cf., *Gross v. Connecticut Mut. Life Ins. Co.*, 361 N.W.2d 259, 269, 270 (S.D.1985), the right of circuit court judges to consider ordinary experiences

and observations in daily affairs of life as a fact-finder. Truly, I am not a fact-finder. We must, however, at the appellate level, seek a just balance between the objectivity of theoretical decision making and the subjectivity which can be found in the process of deciding cases. In my opinion, no judge is free of subjective influences, some largely centering on his life's experiences. In *Gardner v. Toilet Goods Association*, 387 U.S. 167, 201, 87 S.Ct. 1526, 1543, 18 L.Ed.2d 704 (1967) Justice Tom Clark related, in his dissenting opinion, how he deplored the practices of pharmaceutical companies; then, he proceeded to relate how he was recently "gouged" by paying an exorbitant price for certain eyewash drops. In other words, he was subjectively influenced by facts not directly in the record in arriving at his decision.

I have lived my entire lifetime in South Dakota. So I, through my experience, have knowledge of jail settings. As a lawyer who practiced for 22 years and as a former Circuit Court Judge, I have visited and seen many jails. I can assure the reader that *some* jail settings in this state are filthy and antiquated, not all. Taking blood, in jails, by force, such as this, is dangerous to our society. It is, simply, a brutal assault upon the constitutional guarantee to be free of *"unreasonable* search and seizures:"

> The right of the people to be secure *in their persons*, houses, papers and effects, *against unreasonable searches and seizures*, shall not be violated ... U.S. Const. amend. IV. (Emphasis supplied mine).

The signers of the United States Constitution would never have envisioned that brutality would be countenanced as "reasonable." Acts such as we have before us, are offensive to that sense of justice condemned in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). I re-emphasize: it was not necessary to take the blood at all. A great amount of physical evidence had therebefore been martialed by the state.

Law can only practice its rightful role when it adapts itself to the contemporary

way of life and social conditions which exist. We live in times of rapid social, scientific and economic change. As change evolves, the law must meet the challenges which change births. Law must be viable—attuned to the times. Yet, I fully appreciate that those men and women who sit on the bench must not lose sight of continuity and predictability. Two concepts in the law, growth versus stability, appear to war with one another, as if they are totally repugnant, but are they? In the advancement of justice can they not co-exist? Within the language of *Schmerber*, we can let the growth of law continue, but likewise approve of sensible, reasonable growth.

"Means and procedures employed, in blood extraction, [must respect] relevant Fourth Amendment standards of reasonableness." *Schmerber*. *Schmerber* concludes with the warning:

> It bears repeating however, that we reach this judgment only on the facts of the present record. That today we hold that the Constitution does not forbid the State's minor intrusion into an individual's body under stringently limited conditions and in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

*Id.* 384 U.S. at 772, 86 S.Ct. at 1836. No, *Schmerber* does not support the majority's position. It supports this writer's position. And, so far, to my limited recall and oodles of research, over a span of a decade, I have been unable to find where the South Dakota State Legislature has overpowered the United States Constitution or the Highest Court of this Land.

I am likewise concerned with the transmission of communicable diseases via forcible blood extraction in a jail environment. In a Survey of Social Interests, Roscoe Pound, which article is found at 57 Harvard L.Rev. 1, 4, 6–7, 16–18, 20–27 addressed, inter alia, safety of the people and opined that it was the highest law. He reflected that general health and general morals are in the "police power" to which natural rights must give way. Pound expressed: "In another form, quite as obvious today but not so apparent in the past, before the nature and causes of diseases were understood, it is an interest in the general health." I would establish a distinguishing precedent or rule to *Schmerber* because of this concern and to permit the law to be viable—attuned to the times. My thoughts are not competitive to *Schmerber*, rather, they serve as a complementary force with it. In essence, we cannot mechanistically squat on the historical decision of *Schmerber*, but must be innovative by adapting the law to the momentous social changes of the day. We must protect "domestic tranquility" (set forth as a purpose of this nation in the Preamble of the United States Constitution) by aborting decisions and acts in a jail environment which are dangerous to the public health.

My mind travels to the great nations and cultures of the world, birthed in revolution and freedom, which toppled in decadence due to the heavy hand of government. I believe that a judicial blessing of the heavy hand of the executive branch of government, in this case, is contrary to the great precepts of this Republic. My job is not to "cooperate" with the executive branch but, rather, to check on it. Yes, to stop excesses. This is my constitutional mission and obligation.