**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Shelby G. SICKLER, Sr., Defendant and Appellant.**

No. 17622.

Supreme Court of South Dakota.

Considered on Briefs April 20, 1992.

Decided July 22, 1992.

Rehearing Denied Aug. 27, 1992.

Mark Barnett, Atty. Gen., Pierre, Jeffrey P. Masten, Lincoln County State's Atty., Canton, for plaintiff and appellee.

Eugene J. Irons, Canton, for defendant and appellant.

MILLER, Chief Justice.

Shelby Sickler appeals his conviction of driving of a vehicle while under the influence of alcohol. We affirm.

## FACTS

During the late afternoon of October 17, 1990, Marlyn Jacobsen, a county highway employee, was driving east on Highway 18 (near Canton, South Dakota) when he observed a 1976 Chevy pickup stopped in the driving lane. After Jacobsen passed the pickup, it began moving again. Jacobsen noticed the pickup was being driven "erratically." In fact, the pickup caught up with Jacobsen and passed him when cars were approaching, forcing traffic from both directions onto the shoulder.

Jacobsen, concerned that the driver may harm someone, radioed the license plate number to the dispatcher of the civil defense channel.[1] Jacobsen radioed a second time to report the last location of the pickup, which had pulled off to the south and was sitting at the end of a gravel road near the intersection of Highways 18 and 11.

Sheriff Ken Albers was in his office when Jacobsen radioed the dispatcher. He drove to the intersection of Highways 18 and 11 and found a pickup meeting the description given by Jacobsen with the same license plate number. The engine was running and Sickler was in the driver's seat "fiddling" with the radio. Sheriff Albers noticed the strong odor of alcohol and the fact that Sickler had urinated on himself. (Sheriff Albers conducted no field sobriety tests and never searched the vehicle for empty containers.) Sheriff Albers was later joined by police officer Carroll Johnson.

Sheriff Albers placed Sickler under arrest and later advised him of his implied consent rights. He transported Sickler to the Minnehaha County Jail in Sioux Falls, where a blood sample was drawn. The blood test results later revealed Sickler's blood alcohol level was 0.222%. Sickler was subsequently convicted for violating SDCL 32–23–1 and SDCL 32–23–4.6 (fourth conviction of SDCL 32–23–1). Sickler appeals.

## DECISION

### I.

Whether the trial court erred in denying Sickler's discovery motion and his motion to suppress.

Sickler filed a five-page motion for discovery. In response to this motion, the

---

1. The dispatcher is located in the sheriff's office.

trial court entered its standard discovery order pursuant to SDCL ch. 23A–13 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ "In furtherance of justice a trial court has inherent power on behalf of an accused in a criminal proceeding to compel production and to permit inspection of evidence in the possession or under the control of the States Attorney." *State v. Wade,* 83 S.D. 337, 343, 159 N.W.2d 396, 400 (1968). Furthermore, "[a]n accused's application for inspection or disclosure is a matter addressed to the sound discretion of the trial court which may be granted as an aid to the ascertainment of the truth or as a matter of fundamental fairness." *Id.*

The trial court's order included the following:

(1) Any relevant written or recorded statements made by defendant;

(2) The substance of any oral statement which the State intends to offer;

(3) Recorded testimony by defendant before the grand jury relating to the offense;

(4) Copy of defendant's prior criminal record;

(5) Books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof which are material to the preparation of defendant's case or intended for use by the State as evidence in chief or were obtained from or belong to defendant.

(6) Results or reports of physical or mental examinations, scientific tests or experiments.

■ Once the trial court has ordered production of certain evidence, State must expeditiously carry out and obey those orders. *State v. Sahlie,* 90 S.D. 682, 245 N.W.2d 476 (1976).

The hearing on the discovery motion was March 7, 1991. The trial court entered its order the same day. On April 10, 1991, Sickler renewed his motion for discovery since not all of the requested materials had been provided. The trial was scheduled for April 12, 1991. On April 11, 1991, the trial court held a hearing on the issue. By that time, Sickler had received a transcript from the sheriff of the radio log and a copy of Sickler's prior criminal and driving record. The sheriff's report regarding Sickler's arrest was not provided because no such written report was ever made. Additionally, Sickler wanted information on the type of machine State used to test the blood; the machine's name and model number and how it operated; whether it had been tested; and any other information which would have a bearing on the equipment's integrity. This information from the State Chemist on the testing equipment had not been provided by the state's attorney.

At the April 11th hearing, Sickler made a motion to suppress the results of the blood test and the State Chemist's testimony because he had not received from the state's attorney the information on the testing equipment and procedures used as had been required by the trial court's order. This motion was denied. The trial court made the following comments:

> Counsel, although I'm not happy with the fact you didn't receive the information you requested, nevertheless, the State has accepted and used blood tests in these matters for a long period of time. And the method by which the State Chemists have been reporting the testing in this matter, has been an accepted method and an accepted type of test in this matter.

On the day of the trial, Sickler's counsel was given an opportunity, over the lunch hour, to interview the State Chemist concerning both the blood test and the equipment used in analyzing blood. Although Sickler's counsel spoke with the State Chemist before he testified, he did not ask the State Chemist any questions on cross-examination.

"This Court will overturn the trial court's decision to suppress or not to suppress if we find the trial court has exercised its discretion to an end or purpose not justified by, and clearly against reason and evidence." *State v. Smith,* 477 N.W.2d 27, 31 (S.D.1991); *State v. Zachodni,* 466 N.W.2d 624 (S.D.1991). Based on the

record in this case, we believe the trial court did not abuse its discretion.

It is worth noting that "[t]he state's conduct in the present case is hardly in keeping with the prosecutor's 'overriding obligation, shared by the court, to see that defendant receives a fair trial, however guilty he may be.' " *Sahlie*, 245 N.W.2d at 479 (quoting *State v. Sha*, 292 Minn. 182, 193 N.W.2d 829, 831 (1972)). However, we believe that the prosecutor's violations of the court's discovery order resulted only in harmless error.

## II.

Whether the trial court erred in denying Sickler's motion to suppress the blood alcohol test results because the test was not performed in a reasonable, medically approved manner.

 Sickler argues that the blood sample was not withdrawn in a reasonable, medically approved manner pursuant to *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Bodily substance samples are not subject to the exclusionary rule under the Fourth Amendment if they are taken (1) incident to a lawful arrest, (2) by a reliable and accepted method of obtaining such sample, (3) in a reasonable, medically approved manner, and (4) where there is probable cause to believe that the evidence sought exists. *State v. Lanier*, 452 N.W.2d 144, 145 (S.D. 1990); *Schmerber, supra*. As we stated earlier, this court will only overturn the trial court's decision not to suppress if the trial court has exercised its discretion to an end or purpose not justified by, and clearly against, reason and evidence. *Smith, supra*.

 Sheriff Albers testified that typically blood samples for DUI arrests in Lincoln County are taken at a hospital; however, Sickler was transported directly to the Minnehaha County Jail due to his "extremely unruly behavior." Blood tests do not have to be performed in a hospital; *see*

*Lanier, supra;* however, we do require the blood test to be performed under conditions "which provide a medically approved manner for the specific purpose of drawing blood." *Id.*, 452 N.W.2d at 146. "A crucial factor in analyzing the magnitude of the intrusion is the extent to which the procedure may threaten the safety or health of the individual." *Id.*

The blood sample was taken at the Minnehaha County Jail by Deputy Sheriff Alan J. Penning, a licensed practical nurse with expanded medical capabilities. Penning has been licensed by the South Dakota Board of Nursing as an LPN since 1984 and he completed additional training for the expanded role position. *One of his specialized areas is venipuncture (drawing of blood).*[2] Penning testified that when he entered "the tank" where Sickler was being held, Sickler was on his back on the floor. Penning straddled Sickler to check out the veins in his arms. He testified that it took him five to ten minutes to do this because, "[h]e didn't have very good veins. In the room we were at didn't have very good lights." Later, Sickler was taken to another room and helped to a chair where an officer restrained him in a "semi-sitting" position while Penning withdrew the blood. Sheriff Albers was not in the room when the blood was withdrawn because he thought his presence might upset Sickler.

Penning testified: "I took Mr. Sickler into another room, with a deputy from the Minnehaha County Sheriff's Office, and we attempted to calm him down, quiet him down, so we could do the procedure. We tried one needle stick and he pulled away, because he was in—talking with us at the same time. And we had to do a second stick in order to obtain the blood."

Based upon the foregoing, the procedure employed in no way threatened the safety or health of Sickler, and thus was not overly intrusive. We are convinced that the blood sample was withdrawn in a reason-

---

**2.** Penning further testified that this was the first blood sample he had withdrawn for *blood alcohol* testing.

able, medically approved manner by a qualified nurse.

## III.

Whether the trial court erred in denying Sickler's motion to dismiss because of the insufficiency of the evidence to justify a verdict against Sickler as a matter of law.

■ Sickler argues that the trial court erred in denying his motion to dismiss because the evidence was insufficient to convict him of *driving* a motor vehicle while under the influence of alcohol. The record reveals, however, that there was more than ample evidence to convict Sickler.

■ Furthermore, neither party made any objections, took any exceptions or proposed any additional instructions. The general rule is that when no objections were made by the defendant to any instructions of the court, and the defendant proposed no instructions, there is no question concerning the instructions before this court on appeal. *State v. Holloway*, 482 N.W.2d 306 (S.D.1992); *Carlson v. First Nat. Bank*, 429 N.W.2d 463 (S.D.1988); *State v. White Mountain*, 332 N.W.2d 726 (S.D.1983); *State v. Halverson*, 87 S.D. 110, 203 N.W.2d 421 (1973).

Finally, we have reviewed Sickler's argument that no probable cause existed for his arrest and that he did not receive his implied consent rights. We find these arguments totally lacking in merit.

Affirmed.

WUEST, SABERS and AMUNDSON, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

"Tanks," more readily expressed as "Drunk Tanks" are ordinarily filthy, often with vomit and blood and urine, where drunks are kept because of the fact that they are arrested or picked up by law enforcement because some person is in a state of inebriation. Law enforcement, jailers, sheriffs have these "tanks" for a reason: To isolate people away from other prisoners to avoid confrontations and to permit those arrested to "sober up." Most are poorly lighted and stink. Sickler was thrown into the "drunk tank." After 41 years as a lawyer, judge and justice in this state, I have personally witnessed such conditions in South Dakota. As I expressed in my dissent in *State v. Lanier*, 452 N.W.2d 144, 150:

> We must, however, at the appellate level, seek a just balance between the objectivity of theoretical decision making and the subjectivity which can be found in the process of deciding cases. In my opinion, no judge is free of subjective influences, some largely centering on his life's experiences. In *Gardner v. Toilet Goods Association*, 387 U.S. 167, 201, 87 S.Ct. 1526, 1543, 18 L.Ed.2d 704 (1967) Justice Tom Clark related, in his dissenting opinion, how he deplored the practices of pharmaceutical companies; then, he proceeded to relate how he was recently "gouged" by paying an exorbitant price for certain eyewash drops. In other words, he was subjectively influenced by facts not directly in the record in arriving at his decision.

Here, blood was extracted from Sickler in an unconstitutional manner. Therefore, I dissent to what I consider to be unconstitutionally, offensive conduct by law enforcement officials. I quote from the transcript, at page 149:

Q. (By Mr. Irons, defense counsel): At any point in time were you straddling Mr. Sickler, trying to withdraw the blood sample?

A. (Deputy Penning) Not to withdraw the blood sample, no I straddled him at one time, but it wasn't to withdraw the blood.

Q. For what purposes?

A. To check out his veins in both arms, to see which one was a good one to try to attempt on. I was comparing arms pretty well for blood withdrawing sites.

Q. How long did that take you to do that?

A. Five to ten minutes. He didn't have very good veins. In the room we were at didn't have very good lights.

Q. When you were straddling him, where was he located, Mr. Sickler, that is?

A. On the floor.

Q. On his back?

A. Yeah.

Q. What part of the jail facility was that in?

A. It was in the room that is labeled The Tank.

Q. Pardon?

A. The Tank.

Then, we turn to Page 58 of the Jury Trial Transcript to read:

Q. Are you generally familiar as a result of your training with certain medical terms?

A. Yeah.

Q. Is that something you got into in very much detail or just generally?

A. Not a whole lot of detail, because I'm the only medical person in the jail. So it—kind of taught myself.

Q. How many blood alcohol samples do you withdraw in let's say a year?

A. This is the first one.

Q. First one you ever did?

A. Yeah.

Q. Have you done any since then?

A. For blood alcohol?

Q. Yeah.

A. *Not in the Minnehaha County Jail.* (emphasis supplied mine).

Q. So Mr. Sickler is your one crowning achievement of drawing a blood sample, is that correct?

A. No.

Q. That's not the only time you did it?

A. For blood alcohol?

Q. Right.

A. No. *Yes, he's the only one I've done for blood alcohol.* (emphasis supplied mine).

Q. That's what I thought you said.

A. Yes.

Here, the writer of the majority opinion and the State would have the reader believe that Sickler's objection to withdrawing the blood sample was based solely upon the fact that this was the first time Officer Penning had ever drawn such a sample. False. Rather, this Court and the lawyers of this state are referred to the following discourse between Sheriff Albers and Sickler's counsel which took place at the pretrial motion hearing:

Q. But no mace was used on Mr. Sickler at that time?

A. No.

Q. Was there any difficulty in getting that blood test from him—blood sample from him?

A. *I don't think it was any difficulty that was brought on by Mr. Sickler, if that's what you mean. They had difficulty drawing the blood, but it was like you see that once in awhile, where they have a hard time finding a vein, but it wasn't because he was doing anything.* * (emphasis supplied mine).

Q. It was because of the person taking the sample, rather than Mr. Sickler, himself?

A. Yeah, I guess so.

Q. What I'm getting at is it didn't take three or four police officers to hold him down so they could get a blood sample?

A. No, it sure didn't.

These words come from the lips of the State's witness. Now you, the reader, "read my lips," as President Bush once expressed. It is perfectly obvious that this officer was so inexperienced and so unqualified that he could not find a vein to extract blood. He was pricking and probing in the "drunk tank." And the lights, by the State's own witness, were bad (poorly lit). Can you, the reader, understand to what

---

* How then can State elevate itself over its own sworn testimony? It cannot under the holdings of this Court. *See, Marnette v. Morgan,* 485 N.W.2d 595 (S.D.1992); *Klatt v. Continental Insurance Co.,* 409 N.W.2d 366, 370 (S.D.1987); *Romey v. Landers,* 392 N.W.2d 415, 421 (S.D. 1986); *Miller v. Stevens,* 63 S.D. 10, 17, 256 N.W. 152 (1934); 30 Am.Jur.2d Evidence § 1087 (1967).

extreme this state has ventured into, performing a blood test in an unreasonable, non-medically approved manner? Frankly, the writer finds it outrageous when reading and pondering our Constitution:

> The right of the people to be secure *in their persons*, houses, papers and effects, *against unreasonable search and seizures* shall not be violated ... U.S. Const. amend. IV. (Emphasis supplied mine).

"Unreasonable" has many meanings; among those are irrational, excessive, immoderate, inordinate.

State and the majority writer would have you, the reader, believe that the difficulty in securing the blood was struggling by Sickler hampering the officer from securing a blood sample. Sheriff Albers, as reflected above, indicates that there was trouble in securing the blood, but it was not Sickler's fault. Albers, inter alia, testified: "... it wasn't because he [Sickler] was doing anything." Remember, Officer Penning reflected that Sickler was lying on his back with the officer astraddle him in "The Tank." Think about that. Isn't that an inappropriate place to take blood (poorly lit and by an inexperienced officer)? Do you call that "reasonable?" I do not. I dub it "unreasonable."

Furthermore, Art. VI, § IX of the State Constitution of South Dakota provides: "No person ... shall be compelled in any criminal case to give *evidence* against himself ..." (emphasis supplied mine). This is a criminal case and Sickler was compelled to give evidence against himself. This provision is the root of the tree, feeding the concept of liberty under law.

Sickler contends there were other available means to take his blood in a reasonable, medically approved manner. Placing Sickler on his back, with the officer straddling him in the drunk tank, taking 10 minutes to probe with a needle, in the drunk tank, where it was poorly lit, is contrary to the teachings of *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1967). Here, Sickler could have been taken to a hospital where a trained, experienced medical technologist under sanitary conditions with the blood taken thereat. No, not in South Dakota. Here, law enforcement is elevated over constitutional safeguards. Brutality, to serve a law enforcement goal, is not a legitimate function of the executive branch. Under the legal precept of *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1830) we, in the judiciary have the power of judicial review. Great men framed our Constitution; as the howl of contemporaries angrily denounce drunk drivers, we should not tear that Constitution asunder by approving of this type of conduct. An unreasonable exercise of government, infringing upon constitutional rights, is a wrong to be rectified by the courts, under the legal precept of judicial review. We jurists must scrutinize the methods employed by law enforcement, fearing the objectives to which they lead.

In *Schmerber,* no force was used. Here, force was used.

In *Schmerber,* we had a hospital setting. Here, we have a jail setting.

Are the administration of blood tests entirely free of Fourth Amendment constraints? Of course not. In *Schmerber,* the United States Supreme Court pointed out that the blood extraction involved "virtually no risk" but added when withdrawn "... by a physician in a hospital environment according to accepted medical practices." 384 U.S. at 767, 86 S.Ct. at 1834. And at 771, 86 S.Ct. at 1836, the *Schmerber* court gave warning to law enforcement officials that it would not tolerate "... *more substantial intrusions, or intrusions under other conditions.*" By the language of *Schmerber,* this Court is dead wrong. *Schmerber* warned against intrusions into the body which "... are made in an improper manner."

State argues, in its brief, page 6:

> Here, the evidence provides a direct link between the observation by witness Jacobson of the erratic driving to the Sheriff's discovery of the same pickup, with the same paint job, with the same license number, in the same location as described by Jacobson, coupled with the Sheriff's personal observations of the Defendant behind the steering wheel,

with the engine running, reeking of alcohol and soaked with urine.

Therefore, there being this type of direct evidence, there was no reason for this type of unsterile, brutal, and unconstitutional action. *See, Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). State had a plethora of evidence to present to a jury.

A Motion to Suppress the blood alcohol test should have been granted. It was error to deny the motion. I would reverse for a retrial on the merits, sans blood test, thereby preserving the constitutional rights of free men. A more studied outrage, on the excesses of law enforcement against our State Constitution, has never been perpetrated. If we, as jurists, sustain this type of procedure, we become responsible for the usurpations we fail to rebuke. Let us fearlessly execute our duty that we do not suffer the indignation of the people nor the denigration of the precious document that fulfills our destiny. Your servant, F. Henderson, July 4, 1992.