**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Edward McDOWELL, Defendant and Appellant.**

No. 14590.

Supreme Court of South Dakota.

Argued Nov. 20, 1985.

Decided July 24, 1986.

Craig M. Eichstadt, Asst. Atty. Gen., Mark V. Meierhenry, on brief, Atty. Gen., Pierre, for plaintiff and appellee.

Sidney B. Strange, of Strange & Palmer, Steve Miller, on brief, Sioux Falls, for defendant and appellant.

HENDERSON, Justice.

### ACTION

This is an appeal by Edward McDowell (defendant) from a Judgment of Conviction and Sentence for first-degree murder. Defendant was charged under SDCL 22–16–4, found guilty by a jury in Pennington County, and sentenced to life imprisonment. We affirm.

### FACTS

Defendant and Barbara McDowell were married in 1972. After several moves and career changes for defendant, defendant and his wife settled in southeastern South Dakota. In early 1981, defendant was hired as the Chief of Police for Tea, South Dakota. Tea is in southeastern South Dakota, situs of the murder, and the trial of this case took place in Pennington County, South Dakota, which is in the extreme western part of our state. During this aforementioned employment, defendant met Mrs. Darlene Plucker (Plucker). Defendant and Plucker became close friends. Plucker had surgery in August 1980, wherein her colon was removed. She necessarily wore equipment on her side for disposal of waste. It appears her husband simply could not accept her as a woman following this surgery and a serious rift developed between them. She sought, and obtained, a position as the finance officer of the City of Tea. Plucker was given emotional support by defendant. Defendant confided unto Plucker that his marital life was devoid of sex. This companionship and exchanged confidences begot an intimate relationship. This intimate relationship then begot a sexual/financial/business affair or relationship wherein Plucker would loan defendant money from her personal accounts and also from the business account in which defendant, Plucker, and their respective spouses were partners.*

In late 1982, and on through 1983, defendant was spending more money than he was earning. To make up this deficit, defendant obtained various loans, and, as stated above, he received money from Plucker—some personal, some business.

In February 1983, defendant and Plucker devised and attempted a plan to kill defendant's wife by exchanging some medication. Defendant's wife had a vested retirement account and $100,000 in life insurance from her employment. According to Plucker, who testified for the State and against her

---

* This reminds us of an old principle, expressed in Latin: Quae mala sunt inchoata in principio vix bono peragantur exitu. Things bad in principle at the commencement seldom achieve a good end.

paramour, Plucker obtained a three-months' prescription of Brevicon and gave these tablets to defendant. Supposedly, the scheme between Plucker and defendant was to kill defendant's wife by substituting Brevicon for Synthroid tablets. Defendant's wife took Synthroid tablets to maintain a hormone balance. Brevicon tablets are an oral contraceptive which have a like appearance to Synthroid tablets. We are unable to state, from the evidence, whether defendant ever substituted this medicine, but the plan to kill defendant's wife by medicine went awry.

When this scheme did not work, a second plan involving a hammer was devised to kill defendant's wife but apparently was not attempted. This plan partook of Plucker purchasing a hammer for defendant. Defendant was to hit his wife on the head and make it appear as though she had a dizzy spell and fell upon the stairs, causing her death. Obtaining a new hammer grew from the idea that an old hammer would have rust particles and would be found on the wound. Killing defendant's wife by a hammer blow was not attempted but was planned as stated aforesaid.

A third plan then evolved to bring about the death of defendant's wife. This one involved a gun, and by this plan, defendant's wife was murdered in her kitchen. In April 1983, defendant asked Plucker to meet him behind her house, which she did. He thereupon displayed an old city gun, belonging to the City of Tea, and he asked that Plucker go to defendant's apartment and shoot his wife. He could not do it himself, he explained, for if he did so, he would be the first suspect. As a corollary, if not reciprocating act, defendant told Plucker that he would shoot and kill Plucker's husband if it became necessary at a later date. Again, in May and June 1983, defendant explained to Plucker that killing his wife, by using the old city gun, had definite advantages. Plans were finalized for the murder on June 15, 1983. And it was on this date, that defendant's wife was killed. Evidence reflects that defendant was sorely in debt and was being hounded by his creditors, and his ex-wife was asking for child support. He had written a number of insufficient funds checks. Defendant's gambling activities, in addition, had caused him more financial woe and Plucker was unable to furnish him with money to extricate himself from his debt-ridden background. Plucker had quit her job as the city finance officer and had decided to run for the city council. Defendant had decided that he was going to go into a bookmaking operation with his uncle. Capitalization was needed, and defendant was well aware of the $100,000 life insurance policy impressed on his wife's life.

This brings us to the afternoon and day of the murder. At or about 2:00 p.m. on June 15, defendant begged Plucker to kill his wife and expressed that if she did not do so, he would either leave the community or kill himself. According to Plucker, she tried to talk defendant out of this conspired murder. She relented, she testified, because defendant was desperate and she was in an emotional state. Defendant loaded the city service gun, showed Plucker how to fire it, and told her how to shoot his wife. He explained that he had chosen this particular gun because it was in the city safe and no one would suspect that the city gun would be used. According to Plucker, defendant told her how to shoot his wife from the stairs. She indicated to him that she would probably not be able to hit defendant's wife from a distance, whereupon, defendant suggested that she just walk up behind his wife and shoot her and kill her. Defendant planned an alibi which consisted of a story that he would go to the dog track and attend some races. Plucker was advised by defendant to hide the gun, take a shower, and wash her clothes after the murder so as to remove all gun powder residue.

At approximately 10:00 p.m. on June 15, 1983, Plucker went to the defendant's residence. She had the gun, given to her by defendant, and loaded for her by defendant. She had hidden this gun in a cowboy boot and ridden to defendant's house on a bicycle. Plucker asked Mrs. McDowell if she would make coffee. Defendant's wife

agreed. Thereupon, defendant's wife went to the kitchen sink to run water to make the coffee; Plucker went to the living room, pulled the gun out of her boot, walked up behind defendant's wife, pointed the gun at defendant's wife's head, and pulled the trigger. Immediately, defendant's wife fell to the floor. Plucker stepped over her body and ran out the door. Plucker put the gun back into her boot and rode the bicycle home, placing the murder weapon in her garage. She then showered, put on a robe, and washed her clothes. Expressing that she could not settle down, she testified that she moved the gun from her garage to her car and might have moved it several times after that. When defendant returned, the murder weapon was in Plucker's car.

According to Plucker, defendant telephoned her at about 11:45 p.m., advising her to wash her hands with gasoline to avoid any trace of elements resulting from firing the gun. Later, Plucker requested defendant to take the gun out of her car and put it in his car, which he did.

Defendant took the stand during the trial and denied any participation in the murder, alibiing about times and places he was at during the course of the day and evening. Obviously, the jury placed no credibility in his statements. It was the defendant who called the sheriff, causing the sheriff to come to the home where his deceased wife did now lie, and whereupon an entire investigation began on the cause of death of Barbara McDowell. Cause of death, established by an autopsy, was a single bullet lodged in the brain' between the eyes. Throughout the investigation, testimony reveals that Plucker and defendant remained in close contact with defendant making varying suggestions to Plucker so as to cover up the murder.

On October 20, 1983, a Lincoln County Grand Jury indicted defendant for first-degree murder. After a change of venue, trial was held in Pennington County from March 5, 1984, through April 29, 1984. On April 29, the jury returned a verdict finding defendant guilty of first-degree murder.

On May 8, 1984, the trial court sentenced defendant to life imprisonment.

We address four separate issues seriatim.

## I.

DID THE EXCLUSION FOR CAUSE, DURING THE VOIR DIRE PROCEDURE, OF PROSPECTIVE JURORS WHO EXPRESSED A COMPLETE INABILITY TO IMPOSE A DEATH SENTENCE, VIOLATE DEFENDANT'S RIGHTS UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SOUTH DAKOTA CONSTITUTION ARTICLE VI, § 7?

■ Prior to trial, the State notified defendant that it would seek the death penalty. The trial court therefore permitted the State to inquire whether prospective jurors could follow the trial court's instructions relating' to the imposition of the death penalty. During voir dire, eight jury panel members were excused because they expressed an inability to impose the death penalty and one was excused because she indicated she would automatically impose the death penalty. Defendant moved that such inquiries not be allowed but the trial court denied the motion.

Defendant contends the exclusion for cause of prospective jurors who could not vote to impose the death penalty, from the guilt-determination phase of his bifurcated trial, violated his rights under the Sixth Amendment and S.D. Const. art. VI, § 7. For the reasons expressed below, we disagree.

First, although the systematic exclusion of distinct groups of citizens from jury panels violates a defendant's constitutional rights, *State v. Hall*, 272 N.W.2d 308, 310–11 (S.D.1978), citizens who express a complete inability to impose the death penalty do not constitute a distinct group. *Lockhart v. McCree*, —— U.S. ——, ——, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137, 150 (1986). To constitute a distinct group, the group must be cognizable. *United States v. Test*, 550 F.2d 577, 591 (10th Cir.1976). It must

have some internal cohesion and it must be such "an identifiable group which, in some objectively discernible and significant way, is distinct from the rest of society, and whose interests cannot be adequately represented by other members of the ... panel." *United States v. Potter*, 552 F.2d 901, 904 (9th Cir.1977). Those who cannot impose the death penalty have numerous and countless reasons and rationales for that inability. *See People v. Fields*, 35 Cal.3d 329, 349, 197 Cal.Rptr. 803, 815, 673 P.2d 680, 692 (1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 267, 83 L.Ed.2d 204 (1984). Thus, there is no internal cohesion, no cognizability, and no objectively identifiable group distinct from the rest of society. Groups, which are solely defined in terms of their shared attitudes which would prevent or substantially impair members thereof from performing one of their duties as jurors, are not distinctive groups. *Lockhart*, —— U.S. at ——, 106 S.Ct. at 1766, 90 L.Ed.2d at 150.

Second, assuming such individuals do constitute a distinct group, their exclusion is prohibited only from jury wheels, pools of names, panels or venires from which juries are drawn. The jury actually chosen does not have to "mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690, 703 (1975). *See also, Duren v. Missouri*, 439 U.S. 357, 363–64, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579, 586–87 (1979). In the present case, those expressing an inability to impose the death penalty were not systematically excluded from the jury pool, and thus defendant has no grounds for complaint. *Lockhart*, —— U.S. at ——, 106 S.Ct. at 1764–65, 90 L.Ed.2d at 147–48.

Third, defendant has failed to show that his jury, or death-qualified juries in general, are conviction prone and not impartial. Defendant has not presented any empirical evidence, studies, etc. Thus, any impartiality claim is unsupported. *Compare, e.g., Sullivan v. Wainwright*, 464 U.S. 109, 111, 104 S.Ct. 450, 451, 78 L.Ed.2d 210, 212–13 (1983); *Keeten v. Garrison*, 742 F.2d 129, 131–33 (4th Cir.1984); and *Spinkellink v.*

*Wainwright*, 578 F.2d 582, 593–94 (5th Cir. 1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). *See also, State v. Kingston*, 84 S.D. 578, 586, 174 N.W.2d 636, 640 (1970), wherein we disagreed with the argument that removal of potential jurors because of their conscientious objections to the death penalty, resulted in a jury organized to convict.

Finally, we reject defendant's invitation to follow *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir.1985), which held a death-qualified jury to be a denial of the right to a representative cross-sectional jury. *Grigsby* goes against the great weight of federal and state authority and was recently overruled in *Lockhart*. Although this Court is the final authority on the interpretation and enforcement of our state constitution, *State v. Opperman*, 247 N.W.2d 673, 674 (S.D.1976), and we have the power to provide individuals with greater protection under our state constitution than does the United States Supreme Court under the federal constitution, *id.*, we find the decision and reasoning in *Lockhart* to be persuasive and we expressly subscribe thereto in regard to our state constitution. Therefore, defendant's constitutional rights, under either constitution, were not violated.

## II.

WAS DEFENDANT DENIED A FAIR TRIAL AND DID THE TRIAL COURT ABUSE ITS DISCRETION WHEN IT DENIED MOTIONS FOR MISTRIAL PREMISED ON ALLEGED INSTANCES OF PROSECUTORIAL MISCONDUCT?

■ Defendant contends he was denied his constitutional right to a fair trial under the Fourteenth Amendment to the United States Constitution and S.D. Const. art. VI, § 2, because of various alleged instances of prosecutorial misconduct. These alleged instances of misconduct are: (1) in response to a discovery motion, the prosecutor filed two documents in the court file— which is open to public inspection—which outlined the State's evidence, and because

of the resulting publicity, a change of venue was necessary; (2) the prosecutor notified the defendant of the State's intent to seek the death penalty—thus resulting in a death-qualified jury—but following the return of the guilty verdict, the prosecutor waived the death penalty; (3) the prosecutor introduced a prejudicial tape recording and then failed to connect it with foundational evidence as required by the trial court; (4) during cross-examination of the defendant, the prosecutor improperly suggested facts and posed improper questions; and (5) the prosecutor made an improper comment to the jury and elicited evidence concerning the possibility of plea bargains.

Defendant objected to the above occurrences and made numerous motions for dismissal and mistrial. The trial court, however, denied defendant's motions and when appropriate, it struck the testimony or evidence and admonished the jury to disregard the same.

The State advances various reasons and rationales for the above occurrences and asserts that none constitute prosecutorial misconduct or prejudicial error. We note that ruling on a motion for mistrial is within the trial court's discretion, *State v. Disbrow,* 266 N.W.2d 246, 252 (S.D.1978); that an actual showing of prejudice must exist to justify the granting of a mistrial, *State v. High Elk,* 298 N.W.2d 87, 89 (S.D.1980); and that we will not disturb the trial court's ruling on a motion for mistrial unless we are convinced there was a clear abuse of discretion. *State v. Kidd,* 286 N.W.2d 120, 122 (S.D.1979).

Here, given the length of the trial, the isolated nature of some of the objectionable occurrences, the context in which they transpired, the arguable basis therefor, the corrective procedures implemented, the cumulative nature of some of the objectionable matters which are supported by other competent evidence, the insignificance of the alleged errors when compared to the evidence of defendant's guilt, and the absence of a clear showing of prosecutorial bad faith, we conclude the trial court did not abuse its discretion by denying defendant's motions for mistrial. We conclude the defendant received a fair trial as required by our state and federal constitutions. It is not required that defendant receive a perfect trial, only that he receive a fair trial. *Brown v. United States,* 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208, 215 (1973).

### III.

DID THE TRIAL COURT ABUSE ITS DISCRETION BY ADMITTING TESTIMONY OF A THREAT DEFENDANT MADE AGAINST HIS WIFE IN 1975?

██ This is an evidentiary issue. Over defendant's objection, a witness for the State, Jeannie Ellefson (Ellefson), testified that she worked with the defendant in 1975. Defendant received many calls at work from various women which triggered Ellefson to ask defendant if he had a good marriage. Defendant told her that being married to his wife helped him get his citizenship plus her paycheck and that down the road, he thought maybe he would get rid of her. Asking him what he meant by this statement, defendant replied that perhaps his wife would have a hunting accident. Learning that defendant's wife had been murdered, Ellefson told the authorities of this conversation pending the investigation of the murder. Defendant's brief alludes to this statement as being expressed in a joking manner. Ellefson, however, testified she did not believe that the statement was a joke at the time it was made.

Before this evidence may be admitted, it must be relevant, per SDCL 19–12–1, and its probative value cannot be substantially outweighed by the danger of unfair prejudice. SDCL 19–12–3. This necessarily includes a balancing test. When the trial court's admission or denial of such evidence is contested on appeal, our scope of review is whether the trial court abused its discretion. *State v. McNamara,* 325 N.W.2d 288, 291 (S.D.1982). Herein, the record definitely reflects that the trial court did weigh this matter.

Defendant contends the trial court abused its discretion in admitting the above testimony as it was not relevant because too remote. Further, it is asserted the State had no need for the evidence, given the other evidence presented.

In the present case, a first-degree murder case, the prior threats/statements of calculated murder occurred eight years before the premeditated killing. The record reveals that aside from the 1975 statements and the fatal scheme ultimately implemented, defendant designed and sought to carry out three other plans for the killing of his wife. By the very nature of premeditated murder, if the criminal is to avoid detection and apprehension, timely deliberation is required. The 1975 statements reveal a premeditated murder scheme of long duration and do not involve collateral matters offered solely for prejudicial purposes. Our statute on first-degree murder requires a "premeditated design to effect the death of the person killed...." SDCL 22–16–4. Defendant's 1975 statement was relevant to a longstanding premeditated design to effect the death of his wife.

As for defendant's contention that the State had no need for this evidence, we dismiss this contention. Excluding accomplice Plucker's testimony, the State's case was not so overwhelming that there was no need for it. As we stated in *State v. Johnson*, 316 N.W.2d 652, 655 (S.D.1982), the State can hardly be faulted for not wanting to rely solely on Plucker's testimony and the circumstances surrounding the crime. We conclude the trial court did not abuse its discretion when admitting the testimony pertaining to the 1975 threat on defendant's wife.

## IV.

### DID THE STATE ADEQUATELY CORROBORATE THE TESTIMONY OF ACCOMPLICE PLUCKER?

SDCL 23A–22–8 provides:

A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence which tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof.

In *State v. Rauscher*, 267 N.W.2d 582, 583–84 (S.D.1978), we explained that this statute

does not require that corroborative evidence be produced which, by itself, would sustain a conviction. The rule is satisfied if such evidence in some substantial degree (1) tends to affirm the truth of the testimony of the accomplice, and (2) tends to establish the guilt of the defendant. Circumstantial evidence may be sufficient to corroborate the testimony of an accomplice, but if a circumstance is as consistent with innocence as with guilt, then it cannot be held to corroborate the testimony given by the accomplice. (Citations omitted.)

*See also, State v. Wiegers*, 373 N.W.2d 1, 16 (S.D.1985); *State v. Feyereisen*, 345 N.W.2d 58, 60 (S.D.1984); and *State v. Nelson*, 310 N.W.2d 777, 778–79 (S.D.1981).

■ On appeal, defendant contends the corroboration instruction misstates the law and that sufficient corroborative evidence was not presented. However, the record reveals that defendant failed to object to this instruction. Having failed to object to the instruction, we are precluded from considering this claimed error. *State v. West*, 344 N.W.2d 502, 504 (S.D.1984); *State v. Ellefson*, 287 N.W.2d 493, 496 (S.D.1980).

■ As for defendant's second contention on this issue, the voluminous record herein contains sufficient corroborative evidence which substantially tends to affirm the truth of Plucker's testimony and establishes defendant's guilt. To cite a few examples, we refer to the evidence revealing a close association between defendant and Plucker before, after, and during the murder; *State v. Schafer*, 297 N.W.2d 473, 475 (S.D.1980); and to the evidence of defendant's access to the murder weapon. *State v. Brown*, 285 N.W.2d 848, 851 (S.D.

1979). Defendant also led the sheriff to the murder weapon after the murder.

Accordingly, we affirm the Judgment of Conviction.

FOSHEIM, C.J., MORGAN and WUEST, JJ., and DUNN, Retired Justice, concur.

DUNN, Retired Justice, sitting for HERTZ, Circuit Judge, Acting as Supreme Court Justice, disqualified.

SABERS, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.