STATE of South Dakota, Plaintiff
and Appellee,

v.

James Elmer SMITH, Defendant
and Appellant.

No. 17118.

Supreme Court of South Dakota.

Argued May 20, 1991.
Decided Oct. 30, 1991.

Gary Campbell, Asst. Atty. Gen. (Mark Barnett, Atty. Gen., on the brief), Pierre, for plaintiff and appellee.

Mark Meierhenry and Sabrina Meierhenry of Meierhenry & Meierhenry, Sioux Falls, for defendant and appellant.

HENDERSON, Justice.

### PROCEDURAL HISTORY/ISSUES

On October 17, 1989, James Elmer Smith (Smith) was arrested in connection with the robbery of the First American Bank in Lincoln County, Fairview, South Dakota. A customer, Mary Stensland (Mrs. Stensland) was killed in the course of the robbery. Paul T. Wood (Wood) was also arrested in connection with the robbery. Smith was indicted on October 27, 1989. On January 9, 1990, the State filed a notice of intent to seek the death penalty. A new Indictment was filed on March 13, 1990, after the trials of Wood and Smith were severed. This Indictment charged Smith with First Degree Murder (SDCL 22–16–4, 22–30–1), First Degree Robbery (SDCL 22–30–1, 6), and Commission of a Felony While Armed with Firearms (SDCL 22–14–12). Smith was further charged as an Habitual Offender.

The trial commenced on February 28, 1990, and concluded on March 23, 1990. Smith was found guilty on all counts and sentenced to serve two concurrent life sentences on March 28, 1990. On appeal, Smith argues:

(1) He was unlawfully stopped and searched which required suppression of evidence;

(2) The Court should affirm the jury's decision not to levy the death penalty;

(3) The trial court erred in refusing to grant a transfer of venue;

(4) The trial court erred in refusing to grant the defense request for a pretrial attitudinal survey;

(5) The trial court erred in allowing evidence of other bad acts during voir dire and at trial; and

(6) He suffered prejudice through the State's late notice that Wood and two other witnesses would testify against him.

We affirm. Due to our decision, we decline to address issue two.

### FACTS

In August 1989, Wood gained employment with a traveling carnival concession, working with a man whom he knew only as "Dave."[1] The carnival moved through various states including Minnesota, Missouri and Arkansas. In October, the pair eventually made their way to Canton, South Dakota, in a blue Chevy Monza, for which they had Alabama and Arkansas license plates. While in Canton, the pair met with one of Wood's friends, Grant Wayne Wilson (Wilson). According to Wilson, it was at this point that Smith raised the subject of robbing a bank, either in Hudson or Fairview, both South Dakota communities. Apparently, Smith tried to recruit both Wilson and his wife. However, they both declined his offer.

After a few days in Canton on the evening of October 8 or early morning October 9, Smith and Wood burglarized a bowling alley. Wood testified that Smith was the instigator and that $100 was taken in this incident. The same night, Smith and Wood burglarized Don's Clover Farm Grocery Store in Inwood, Iowa. Wood testified that Smith made the entry and located the money while he accompanied Smith.

Smith and Wood left Canton early in the morning on October 9 checking into the

---

1. "Dave" is the alias employed by Smith.

Cloud 9 Motel in Sioux Falls.[2] They eventually left the Cloud 9 Motel and moved to the Nites Inn, also in Sioux Falls.

On October 13, 1989, Smith purchased a "stun gun." On October 14, 1989, Smith purchased a 1976 Plymouth Fury from William Hartman (Hartman). According to Hartman, the two men arrived at his home in a blue Chevy Monza with Arkansas plates. He testified that the older of the two had a southern drawl, a mustache, and long sideburns.

The next day, Sunday, October 15, 1989, Smith told Wood that they were going to rob the bank in Fairview, explaining Wood's role to be that of a "lobby man." The next morning, October 16, 1989, they began the journey to Fairview. Various weapons were placed in the trunk, including a .32 handgun and a .22 handgun. Smith drove the Plymouth while Wood took the Monza. They stopped at an abandoned farm house north of Fairview, parked the Monza and tried to erase any fingerprints off the Plymouth. Smith then drove the Plymouth into Fairview. At first, the pair waited for customers to leave the bank, but when this did not happen, they entered the bank. It was approximately 2 p.m.

At the time of the robbery, six people were present in the bank, Doris Harms (Harms) a bank employee, Mrs. Stensland, Lorraine Niemeyer (Niemeyer), and Dolores Brown (Brown) who was accompanied by her two children. According to testimony, Smith called out, "This is a bank robbery," then ordered everyone to get down on the floor. Harms complied but Niemeyer, Mrs. Stensland and the Brown family did not. Smith struck Brown on the shoulder then turned toward Mrs. Stensland and fired his gun, hitting Mrs. Stensland at the base of the neck. Mrs. Stensland bled to death at the scene within a few minutes. At this point, Smith leaped over the bank counter, ordering Harms to give him all the money in the vault. He left footprints on the countertop which matched his tennis shoes taken from him after his arrest. Ap-

proximately $14,000.00 was taken. Many of the bills were "bait money" with their serial numbers on file.

Smith and Wood left the bank and drove away. On the way out of town, they nearly collided with a car driven by Alice Van De Stroet, who saw two men in a large car. She testified the Plymouth, as depicted in a photograph taken by the State, looked like the car which passed her. The pair drove to the place where they left the Monza and switched cars. They proceeded to Sioux Falls, with Wood in the backseat, for concealment. According to Wood, it was at this point that Smith smilingly told him, "We had better get out of here, in case I hit her."

After arriving at their motel, Smith telephoned a man who had a 1978 Ford Mustang for sale. They drove the Monza to purchase the new car. Upon completion of the sale, Wood drove the Monza to the Empire Mall. Enroute, the Monza was spotted by Daryl Wagner, who heard radio reports that a suspect was being sought in a blue Monza with Arkansas plates. Wagner immediately reported his brief encounter to the police.

Smith and Wood parked in the Empire Mall parking lot and moved their possessions to the Mustang. Wood attempted to remove any fingerprints on the Monza. They then drove to Mitchell, South Dakota, leaving the Monza in the parking lot. The Sioux Falls police located the Monza that evening and informed the Lincoln County Sheriff, Kenneth Albers (Albers), of their discovery by radio message.

Prior to the robbery, Albers was looking for a man identified as "Dave" and Wood for questioning in a number of burglaries in the Canton area. He was told by one Grant Wilson (Wilson) of his encounters with "Dave" and Woods. He aided the police on composite sketches of Smith, working with Brown and Niemeyer.

After receiving the telephone call from the Sioux Falls Police indicating that the Monza was found abandoned in the Empire

---

2. In the last week before the Fairview robbery, Smith, accompanied by Wood, unsuccessfully attempted to burglarize a lumber yard and gas station in Hudson, South Dakota. Also, Smith failed to burglarize a bar in Alvord, defeated by a dead bolt lock.

Mall lot, Albers was informed that Wood had checked into the Super 8 Motel in Mitchell. Albers hurriedly left for Mitchell. By the time Albers acquired a search warrant for the motel room, the room was empty.

Albers returned to Canton at approximately 5:30 a.m. on Tuesday, October 17, 1989. Albers updated the radio message, adding that the suspects were believed to have been in the Mitchell area before midnight on October 16 and that they had purchased a 1978 white and blue Dodge Aspen with South Dakota license plates. It was believed that the suspects left Mitchell. Later that day, Albers received word that the Aspen had been spotted west of the Missouri River and was being followed by the Highway Patrol. A roadblock was arranged at which the Aspen was stopped and the driver, Smith, was ordered out of the vehicle. Smith was advised of his rights and placed under arrest. After a search of his pockets, a large amount of currency was removed from Smith's pockets.

At the time of his arrest, Smith was carrying an Oklahoma driver's license in the name of "David Ellis McCalip." One bag of sixty $100 bills was taken from Smith. Twenty-five $20 bills found in Smith's possession had serial numbers matching marked bills taken from the bank in Fairview. The Aspen was subsequently searched pursuant to a warrant and $4,350 was found in a bag in the trunk. The trunk also contained a police equipment belt with a .357 Magnum revolver. A box of .22 Super X long rifle hollow point bullets was found in a cassette tape box in the backseat of the Aspen. Also, in the car were a police radio call book, a radio scanner, a stun gun, and police uniform clothing. Wood was eventually arrested in Canby, Minnesota.

## DECISION

I. *Smith was not unlawfully stopped and searched.*

■ Smith argues that the facts, when taken together, do not constitute probable cause for his arrest. The trial court's findings of fact resulting from a suppression hearing will be upheld unless they are clearly erroneous. *State v. Pfaff,* 456 N.W.2d 558 (S.D.1990). Here, Smith points to no finding of fact which is alleged to be clearly erroneous. Here, we must uphold the trial court's findings because they are not clearly erroneous and are absolutely supported by the record.

■ Whether these facts, taken together, add up to probable cause is a separate question, and we review the trial court's determination under a different standard of review. This Court will overturn the trial court's decision to suppress or not to suppress if we find the trial court has exercised its discretion to an end or purpose not justified by, and clearly against reason and evidence. *State v. Zachodni,* 466 N.W.2d 624 (S.D.1991).

■ Moreover, the definition of probable cause employed by this Court is a question of law, not of fact or of discretion, and, as such, is fully reviewable de novo, with no presumption attaching to the determination of the circuit court. *Id.* at 630.

■ Although the evidence supporting a probable cause determination must be more than a bare suspicion, it need not establish proof beyond a reasonable doubt or even proof by a preponderance. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Furthermore, each element of evidence need not be individually assessed for veracity and basis of knowledge. Rather, the probable cause determination is a function of the totality of relevant circumstances. *Id.,* 462 U.S. at 230–31, 103 S.Ct. at 2328.

■ The information relied upon by the police in arresting Smith was placed in the state teletype system by Albers based upon his own personal knowledge. He obtained information from Wilson linking Wood and "Dave" to local burglaries and plans to rob banks. He received information that individuals matching the descriptions of "Dave" and Wood had been observed by eyewitnesses to rob the First American

Bank and that one suspect had shot and killed Mrs. Stensland.

Further evidence supporting the trial court's determination of probable cause is provided by the pattern of abandoned vehicles left behind by Smith and Wood. A vehicle purchased by an individual matching the description of "Dave" was found abandoned a short distance from Fairview. Another vehicle known to be used by "Dave" and Wood was found abandoned in the parking lot of the Empire Mall in Sioux Falls. These abandonments, combined with the knowledge that the suspects had checked in at the Mitchell Super 8 Motel at approximately 7 p.m. and information provided that a man named "Dave" described as 6 feet tall with dark hair, sideburns, age 40, came to buy a car, the Aspen, at 8:30 to 8:40 p.m. on October 16, are all additional facts which helped provide probable cause to arrest Wood.

II. *The trial court did not abuse its discretion in denying Smith's motion for change of venue.*

�as Whether a change of venue should be granted is a matter within the sound discretion of a trial court and that decision will not be disturbed unless there is an abuse of discretion. *State v. Martin*, 449 N.W.2d 29 (S.D.1989). Under the abuse of discretion standard, this Court does not determine whether it would have made a like decision only whether a judicial mind, considering the law and the facts, could have reached a similar decision. *Pfaff, supra.*

▬ The test for change of venue is prejudice in the minds of the county residents sufficient to raise a reasonable apprehension that the accused will not receive a fair and impartial trial. *State v. Lohnes*, 432 N.W.2d 77 (S.D.1988); SDCL 23A–17–5. The burden of establishing that a fair and impartial trial cannot be had is upon the applicant. *State v. Weatherford*, 416 N.W.2d 47 (S.D.1987). We presume the defendant can receive a fair trial in the

county where the offense was committed. *State v. Lohnes*, 432 N.W.2d 77 (S.D.1988). Pretrial publicity alone is not enough to deny a fair trial or, to warrant a change of venue. *State v. Luna*, 378 N.W.2d 229 (S.D.1985). There must be additional evidence tending to show that such publicity was so prejudicial as to prevent the defendant from receiving a fair and impartial trial in the county. *Martin, supra.*

▬ The trial court found, and we agree, that the newspaper articles and television news reports, while they did cover the crime, were not inflammatory. The media coverage was *factual in nature and did not indicate an opinion as to Smith's guilt or innocence.* Although the pretrial publicity in the present case was extensive, prolonged and contained some inaccurate information, we find that the trial court did not abuse its discretion in denying the motions for change of venue. In denying the initial motion, the trial court stated that "the Defendant has been granted the privilege of individual voir dire to inquire into the substance and effect of pretrial publicity ..." It also stated "the Defendant has been granted the privilege of propounding written questions to the panel for the purpose of determining which jurors may have heard out of court statements relating to this case, and the details of such news or statements." [3] We see this as an attempt by the trial court that it would reconsider the necessity of a venue change at the time of or following jury selection.

When Smith's motion for change of venue was renewed during and after the completion of jury selection, the trial court again denied the motions. The trial court, by implementing special juror questionnaires, ensured that a full inquiry was made into possible prejudice. In addition, defense counsel individually questioned all potential jurors who had been exposed to the pretrial publicity. We note that 11 of 12 jurors were passed "for cause." One juror, who heard the case, and whose qualifications were originally at issue, made

---

**3.** A finding of fact, entered by the trial court, is revealing and probative on this issue: concerning the juror's questionnaires, 73% of the jurors

indicated they had either no opinion regarding Smith or that they could set aside any opinion pertaining to Smith's alleged guilt.

statements as to the death penalty but not to guilt or innocence. Defense counsel ultimately withdrew an objection to her sitting on the jury. She agreed that Smith was innocent until proven guilty. There were 300 jurors called for jury duty; a jury was selected out of the first 100 called. The motions for change of venue were properly denied.

III. *The trial court did not err in refusing to grant the defense request for a pre-trial attitudinal survey.*

The refusal of the trial court to grant the motion for a public opinion survey rests within the sound discretion of the trial court. *Weatherford*, 416 N.W.2d 47. We do not believe the trial court abused its discretion in denying Smith's motion for a survey. Voir dire examination is the better forum for ascertaining the existence of hostility towards the accused. *State v. Reutter*, 374 N.W.2d 617 (S.D.1985). The results of the voir dire indicate an impartial jury was impaneled. *State v. Bonrud*, 393 N.W.2d 785, 791 (S.D.1986). We therefore find no abuse of discretion. *Weatherford*, at 52.

IV. *The trial court did not err in allowing evidence of other bad acts during voir dire[4] and at trial.*

Evidence that a person has committed crimes other than the one for which he is being tried is usually inadmissible. Such evidence, however, may be admitted to show motive, intent, preparation, plan, knowledge, absence of mistake or accident, identity of the accused. SDCL 19–12–5. When ruling on the admissibility of other acts evidence, a trial court must determine: (1) whether the intended purpose for offering the other acts evidence is relevant to some material issue in the case, and (2) whether the probative value of the evidence is substantially outweighed by its prejudicial effect. *State v. Basker*, 468 N.W.2d 413 (S.D.1991). The first inquiry concerns factual relevancy, i.e., whether the proffered evidence has any tendency to make the existence of any fact that is of consequence more probable or less probable than it would be without the evidence. SDCL 19–12–1. The second inquiry is addressed to legal relevancy: whether the probative value of the proffered evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. SDCL 19–12–3. Whether the probative value of the proffered evidence is substantially outweighed by its prejudicial effect is a question left to the sound discretion of the trial court, and on appeal, the trial court's decision will not be disturbed absent a clear abuse of discretion. *Basker*, 468 N.W.2d at 416.

The State argues the trial court was correct in allowing evidence of a string of burglaries[5] undertaken by Wood and Smith in the days immediately before the Fairview bank robbery under the "common plan, design or scheme" exception in SDCL 19–12–5. The "common plan, design or scheme" refers to a larger continuing plan, scheme or conspiracy of which the present crime charged at trial is only a part and which is often relevant to show motive, intent, knowledge or identity. *State v. Champagne*, 422 N.W.2d 840 (S.D.1988). The inference is that since the defendant planned to accomplish the design or scheme, he resolved to do the act and therefore probably did it. *Champagne*, 422 N.W.2d at 842. Here, the acts were nearly contemporaneous as they were so close in time. Conversely, Smith argues that this evidence was irrelevant and immaterial and

---

4. **[15, 16]** We deem this issue to be nonmeritorious. Then Attorney General Tellinghuisen questioned potential jurors whether they would want to know of the existence or absence of a criminal record when considering the death penalty. In each instance, the State did not inform the jurors that Smith had a criminal record. Counsel is allowed a reasonable latitude in questioning prospective jurors and such questioning is left to the trial court's discretion. Hypothetical probing of juror's attitudes towards evidence is permitted. *State v. Miller*, 429 N.W.2d 26, 38 (S.D.1988).

5. Smith's attempted recruitment of friends for bank robberies, including the Fairview robbery.

was offered only to show Smith's bad character. We disagree. A string of burglaries, immediately before the bank robbery, provide an immediate context before the robbery. We conclude that the evidence was properly admitted.

Wood testified about a string of burglaries in which he and Smith engaged in the days prior to the Fairview bank robbery. His testimony tended to establish plan, preparation, method of operation, and identity. We cannot say that Smith was unfairly prejudiced by the introduction of Wood's testimony and the admission of the evidence was not an abuse of discretion.

As to the recruitment of friends and the target practicing with the .22 pistol, this is admissible as background and foundation evidence of the crimes charged. *State v. Dokken*, 385 N.W.2d 493 (S.D.1986).

V. *Smith failed to move for a continuance so his argument has not been preserved on appeal. Furthermore, Smith was not surprised by Wood's testimony.*

Smith, finally, asserts that he suffered prejudice through the State's late notice of Wood's, as well as two other witnesses, impending testimony.[6] Apparently, Smith received notice of this testimony at 6:30 a.m. on March 19, 1990, the day Wood was to testify. However, there is more factual background on this subject to consider in determining if the trial court acted unfairly. There is evidence of record which indicates that the State knew of Wood's testimony prior to this date. This likewise applies to the defendant and his counsel. In fact, Wood was interviewed by the State the weekend prior to his testimony. Before trial, the record reflects that Smith's counsel knew that Wood was negotiating with the State on a plea bargain. Before the State presented its case in chief on March 13, 1990, the State indicated that Wood might be called as a witness and Smith's defense counsel had knowledge of

this information. This record reflects that Smith's defense counsel expressed that the State's Attorney was "forthright" concerning the possible testimony of Wood and that he, Smith's counsel, had been in contact with Wood's counsel four or five days before the March 19, 1990, notification. At a pretrial motion hearing on January 9, 1990, the State's Attorney informed defense counsel "It is the intent of the State to use Paul Wood as a witness for the prosecution in the trial of Mr. Smith." Wood did not solemnize his plea agreement, by which he would testify, until the very morning that he was called as a witness. On the record, the trial court mentioned that there had been discussions, throughout the course of the proceedings, that Wood would be a possible witness and that Smith had been aware of this at all times, from early on in the proceedings. Defense counsel for Smith agreed, on the record, to this statement of the trial court. This is not the surprise witness that Smith would have us believe. His testimony was admissible under these circumstances. *Cf. State v. Burke*, 86 S.D. 737, 201 N.W.2d 234 (1972) for authority pertaining to so-called "surprise." Held: Witness' name inadvertently omitted from Information, but defense counsel aware of prior testimony, thus testimony admissible. Simply put, Smith was anything but surprised and uses this argument in the vein of technicality, rather than reality. A general rule, in criminal procedure, abounds, fully supported by substantial case law, that a defendant in a criminal case must ask for a continuance when confronted with surprise if he wishes to preserve that point on appeal. *See*, 24 C.J.S. Criminal Law § 1431, p. 31. Here, Smith never requested a continuance. It is incumbent on the defense to present the appropriate motion in order to preserve any error on appeal. *State v. Koenig*, 333 N.W.2d 800, 805 (S.D.1983) (quoting *State v. Williams*, 84 S.D. 547, 173 N.W.2d 889 (1970). Smith has not presented his issue for appeal below as he should have. Nevertheless, going to the

6. Two of these "surprise" witnesses, Van Houtten and Schlotfeld, testified that Wood and Smith were in a coffee shop at Alvord on the

Thursday before the Fairview robbery. This testimony was admitted by the trial court as relevant to the chain of events.

merits on the argument, Smith knew from the inception of these criminal proceedings, that it was highly likely that Wood would be a witness for the prosecution. If this were not true, when the trial judge addressed this subject on the record, defense counsel would have taken exception to the trial court's remarks.

■ Finally, we wish to express that this case was fairly tried and that is all that the Constitution requires: a fair trial. The law does not require a perfect trial. *See, State v. Bennis*, 457 N.W.2d 843, 847 (S.D.1990); *State v. Younger*, 453 N.W.2d 834, 841 (S.D.1990); *State v. McDowell*, 391 N.W.2d 661, 666 (S.D.1986). We have, before us, a cold-blooded killing of an innocent woman, committed during the course of an armed robbery of a bank in South Dakota, with at least one eyewitness (Brown) in the bank positively identifying Smith as the robber/murderer.

Affirmed.

WUEST and AMUNDSON, JJ., and ZINTER, Circuit Judge, concur.

SABERS, J., dissents.

ZINTER, Circuit Judge, sitting for MILLER, C.J., disqualified.

SABERS, Justice (dissenting).

The trial court abused its discretion in denying defendant's motion for change of venue under SDCL 23A–17–5.[1]

I would reverse and remand for a new trial in another community in another county. It could be Yankton, Minnehaha, Brookings or Brown. Obviously, Rapid City, Pennington County would do.

I find no fault with the community members of Fairview, Hudson, Canton or Lincoln County. For obvious reasons, those communities were righteously incensed by this senseless, violent crime. In fact, the stupidity and waste of killing Mrs. Stensland, a kind, friendly woman on a whim for

no reason violates not only the peace and well being of these communities, but the communities themselves. In that setting, would any of us be fair and impartial jurors? I submit not.

I realize that a fair and impartial trial is expensive and time consuming, and will probably produce the same result, but fair and impartial trials are required under the law. U.S. Const. amend. VI, amend. XIV; S.D. Const. art. VI, § 7; SDCL 23A–17–5.

The majority cites *Bennis, Younger* and *McDowell* for the proposition that "[T]he law does not require a perfect trial," but overlooks the fact that the law does require a fair trial by impartial, indifferent jurors.

[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of *impartial, 'indifferent'* jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *In re Oliver*, 333 U.S. 257 [68 S.Ct. 499, 92 L.Ed. 682]; *Tumey v. Ohio*, 273 U.S. 510 [47 S.Ct. 437, 71 L.Ed. 749]. 'A *fair* trial in a *fair* tribunal is a basic requirement of due process.' *In re Murchison*, 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942]. ... 'The theory of the law is that a juror who has formed an opinion *cannot* be impartial.' *Reynolds v. United States*, 98 U.S. [8 Otto] 145, 155 [25 L.Ed. 244].

*Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961) (emphasis added).

Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to *prevent even the probability of unfairness.*

*In Re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955) (emphasis added).

No matter how hard people try to be fair and impartial, sometimes it is impossible. One of the jurors, who had previously written that he could be fair, was asked his

---

1. **SDCL 23A–17–5. (Rule 21(a)) Change of county when fair trial impossible in original county.** A court upon motion of a defendant shall transfer his proceedings to another county if the court is satisfied that there exists, in the

county where the prosecution is pending, so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that county.

whereabouts by a neighbor. When he answered that he had gone to be a potential juror *for the man that killed the woman at the Fairview Bank,* he suddenly realized he had already formed an opinion. As stated in counsel's brief, "Sometimes the honesty of one juror explains the problem better than any words a lawyer can write."

The record abounds with statements and examples of prejudice, though probably justifiable, in the hearts and minds of Lincoln County residents sufficient to raise a reasonable apprehension that defendant could not receive a fair and impartial trial. Prejudice was established in pre-trial publicity, media accounts, affidavits of defense counsel and his investigator, the jury questionnaires and in testimony during jury selection and trial. It far exceeds that shown in *State v. Luna,* 378 N.W.2d 229 (S.D.1985) and *State v. Weatherford,* 416 N.W.2d 47 (S.D.1987). This prejudice could not be overcome in the short time between the crime and the trial, nor during jury selection because additional peremptory challenges were denied. As the United States Supreme Court stated, "Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, 'You can't forget what you hear and see.'" *Irvin,* 366 U.S. at 728, 81 S.Ct. at 1645. To which I would add: "You can't overcome what you feel."

These facts required a change of venue more so than any case I have reviewed. If change of venue is not required here, the statute becomes meaningless. If not here! Where? If not now! When?

