**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Steven Alan GANRUDE, Defendant and Appellant.**

**No. 17924.**

Supreme Court of South Dakota.

Considered on Briefs on Feb. 10, 1993.

Decided April 28, 1993.

Mark Barnett, Atty. Gen., Sherri Sundem Wald, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Ron J. Volesky, Huron, for defendant and appellant.

PER CURIAM.

Steven Alan Ganrude (Ganrude) appeals his conviction for aggravated assault and his conviction as an habitual offender. We affirm.

## FACTS

Ganrude's conviction arises out of an altercation during the 1991 State Fair in Huron, South Dakota. The victim was employed by an amusement stand on the fairgrounds and left work at approximately 10:00 p.m. on the night of September 1. He began walking the fairgrounds and eventually encountered Lisa Palmer (Palmer), a girl from his hometown with whom he was somewhat acquainted. Palmer was in the company of Kevin Patalano (Patalano) and the three continued walking the fairgrounds together.

Sometime between 11:30 p.m. and 1:00 a.m., the group came into contact with Ganrude who was emerging from a bar on the fairgrounds. Victim apparently made an insulting remark to Ganrude who pulled a knife out of his pocket. Threatening victim with the knife, Ganrude required him to drink out of a mud puddle and lick and chew from the soles of the shoes of the other individuals in the group. Then, placing his arm around victim so that he could secretly hold the knife on him, Ganrude "escorted" victim and the rest of the group on a walk about the fairgrounds.

During the walk, the group was joined by Francis Arcand (Arcand) who operated a carnival ride called the Thunderbolt. At Ganrude's instance, the group proceeded to the Thunderbolt and entered an accessway under the ride apparently intended to allow service of the machinery. There was enough room under the ride to permit the entire group to enter. Once underneath the ride, Ganrude ordered victim to arm wrestle with Palmer, telling victim if he won he would lose a finger and, if he lost, something else. Victim lost the arm wrestling match and then, operating under threats from Ganrude, arm wrestled Ganrude himself.

Over the next several hours, Ganrude required victim to endure other humiliations under the Thunderbolt including: having "poop" stained underwear placed on

his head; being required to lower his trousers and undershorts and smear grease from a grease gun over his body and private areas; having a sock saturated with grease placed in his mouth; having a pipe swung at his knees; and, having his hands and feet tied up behind his back. Ganrude had his knife out throughout these incidents, at one point telling victim he was going to give him "a Columbian necktie"[1] and at another point placing the knife to victim's adam's apple.

Ultimately, everyone left the Thunderbolt but victim and Ganrude. Ganrude finally untied victim and allowed him to leave when victim promised to give Ganrude his paycheck the next morning. Before victim left, Ganrude told him if he reported the incident his family would be killed and his sister raped.

Victim did report the incident to the authorities. On September 16, 1991, state filed an information charging Ganrude with one count of kidnapping and one count of aggravated assault. State also filed a Part II habitual offender information alleging Ganrude had previously been convicted of eight prior felony offenses. Ganrude's jury trial was held on February 6 and 7, 1992. At the close of trial, the jury returned a verdict finding Ganrude guilty of aggravated assault. The trial court declared a mistrial as to the kidnapping count due to the jury's inability to reach a unanimous verdict on the charge. The jury trial on the Part II habitual offender information took place on April 15, 1992. Thereafter, the jury returned its verdict finding Ganrude to be one and the same person as was previously convicted of the eight prior felonies alleged in the Part II information. Sentencing was conducted on April 20, 1992. An amended judgment of conviction and sentence to life imprisonment without parole was entered on April 29, 1992.[2] Ganrude appeals.

1. A slang expression apparently referencing a cut from one side of the neck to the other.

2. Ganrude has raised a procedural challenge to his habitual offender conviction but has raised no contention that his sentence is disproportionate or cruel and unusual in violation of state and federal constitutional provisions.

## ISSUE ONE

### DID THE TRIAL COURT ERR IN DENYING GANRUDE'S MOTIONS FOR A JUDGMENT OF ACQUITTAL?

At the close of state's case, and at the close of all the evidence, Ganrude moved for a judgment of acquittal on the basis of insufficiency of the evidence. On appeal, Ganrude again urges insufficiency of the evidence as a basis for reversal of his aggravated assault conviction.

> [The] standard of review on a denial of a motion for judgment of acquittal is whether the state set forth sufficient evidence from which the jury could reasonably find the defendant guilty of the crime charged. In reviewing the sufficiency of the evidence, we consider the evidence in a light most favorable to the verdict. A guilty verdict will not be set aside if the state's evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt.

*State v. Blalack*, 434 N.W.2d 55, 59–60 (S.D.1988) (citations omitted).

Ganrude was convicted of aggravated assault under SDCL 22–18–1.1(5):

> Any person who:
>
>    \*     \*     \*     \*     \*     \*
>
> (5) Attempts by physical menace with a deadly weapon to put another in fear of imminent serious bodily harm;
>
> is guilty of aggravated assault. Aggravated assault is a Class 3 felony.

Ganrude asserts state failed in its burden of proof concerning three elements of the offense: first, that there was insufficient evidence he attempted, "by physical menace," to commit the offense; second, that there was insufficient evidence he made the attempt, "with a deadly weapon," i.e., a knife; and, third, that there was insufficient evidence victim was placed, "in fear of imminent serious bodily harm."

In *State v. Gallegos*, 316 N.W.2d 634, 637 (S.D.1982), a defendant who lunged at a police officer with a knife was convicted of aggravated assault under an information charging that he, " 'attempted by physical menace with a knife to put [the officer] in fear of eminent [sic] serious

bodily harm....' " In reviewing the sufficiency of the evidence we held "appellant pulled a knife and waved it in the direction of [the police officer]. [The officer] jumped back to avoid being stabbed ... This evidence is sufficient to support a rational theory of guilt." *Gallegos*, 316 N.W.2d at 639.

■ If anything, the evidence of physical menace in this case is more overwhelming than in *Gallegos*. Ganrude kept a knife pointed at victim in a threatening manner for a period of hours rather than for a single swipe. At times, he vocally threatened victim with loss of his fingers and a, "Columbian necktie." At at least one point, Ganrude placed the blade of his knife directly at victim's throat in the area of his adams apple. Out of fear of being stabbed, victim was forced to endure hours of terrorizing, humiliating acts.

Ganrude contends victim was not menaced because he was within "touching distance" of security officers several times throughout the incident and did nothing to seek their assistance. However, the testimony established that the reason victim did not seek assistance was his fear of being stabbed by Ganrude who had his knife surreptitiously pointed at him throughout that time. This was verified by testimony from the security officers themselves who saw Ganrude with his arm around victim in the manner victim described at trial. Accordingly, based upon the precedent of *Gallegos*, there is sufficient evidence to meet the menace element.

■ In asserting failure of proof of the element of a, "deadly weapon," Ganrude argues, "the record is overwhelming with regard that no knife was used" and that perjured testimony was presented by state to establish the knife's existence. This ignores the testimony at trial. Victim himself testified that Ganrude held a knife on him throughout the assault incident and that he first saw the knife while he and Ganrude were walking around the fairgrounds. Arcand verified that he saw the knife, that he saw it with the blade out and that Ganrude held the knife behind victim.

Palmer also testified that Ganrude had a knife on victim, that he still had the knife on victim when he tied victim up and that he had the knife at or near victim "almost the whole period" of the incident. Finally, Patalano testified that he saw the knife, that Ganrude took it out of his pocket, that it was a switchblade and that Ganrude used the knife to threaten victim.

■ The pages of the transcript Ganrude uses to substantiate his contention that no knife was used refer to instances where Ganrude attempted to impeach state's witnesses with prior inconsistent testimony from the preliminary hearing. However, each of the three witnesses explained that their prior inconsistent statements were made out of fear of Ganrude. Although, the credibility of the witnesses during trial was clearly in question, "in reviewing the sufficiency of the evidence this court does not resolve conflicts of evidence or determine the credibility of witnesses. These are matters for the jury to decide." *State v. Gallipo*, 460 N.W.2d 739, 743 (S.D.1990) (citations omitted). Here, the jury apparently found the testimony of the victim and the three witnesses more credible than Ganrude's[3]. Their testimony, if believed, fully established the existence of the knife used in the assault. Accordingly, Ganrude's contentions concerning failure of proof of a dangerous weapon lack merit.

■ Finally, as to Ganrude's contention concerning lack of proof that victim was placed in fear of imminent serious bodily harm, the record is replete with testimony regarding victim's fear on the night of the assault. At varying points in his own testimony, victim described himself as, "panicking, real scared, terrified, scared out of my mind and scared for my life." Victim's fear was verified by all three of state's witnesses who were present during the incident. All three described victim in varying terms as, "scared, real scared and wanting to cry." Victim's fear was also verified by the security officers who interviewed him shortly after the incident. One of the officers described victim as, "real nervous ... rocking back and forth ...

very upset and distraught ... very broken in speech and seemed real troubled." Another officer testified that victim, "was very nervous, very shaken up ... physically, mentally withdrawn, very tired. He was frightened."

Although Ganrude again attempts to make much of victim's failure to summon the security officers for assistance during the incident, as previously discussed, the victim testified that he failed to call for help because of his fear of being stabbed by Ganrude. Victim's testimony in this regard was verified by Arcand's personal observations of the victim clearly exhibiting fear on the night of the incident.

Based upon the evidence and testimony in this case favorable to the verdict, state provided more than sufficient evidence that Ganrude attempted by physical menace with a deadly weapon to put victim in fear of imminent serious bodily harm. Therefore, the evidence is sufficient to support the verdict and the trial court committed no error in denial of Ganrude's motion for a judgment of acquittal.

## ISSUE TWO

DID THE TRIAL COURT ABUSE ITS DISCRETION IN ALLOWING A LATE ENDORSEMENT OF WITNESSES ON THE PART II HABITUAL OFFENDER INFORMATION?

SDCL 23A–6–10 provides:

The prosecuting attorney shall endorse upon each information the names of the witnesses known to him at the time of its filing. Any further endorsement of names upon the information shall be done only with permission of the court. This section shall not preclude calling any witnesses whose names or the materiality of whose testimony is first learned by the prosecuting attorney during the trial. This section does not require the endorsement of names of witnesses which are to be used only in rebuttal.

"[T]he trial judge has discretion in deciding whether to allow late endorsement of wit-

---

**3.** Ganrude's testimony was that he had a switch-   blade comb instead of a knife.

nesses." *State v. White Mountain,* 477 N.W.2d 36, 38 (S.D.1991).

In this instance, the following witnesses were endorsed on the Part II habitual offender information at the time of its filing:

Law enforcement personnel

Freeborn Clerk of Courts, Albert Lee, Minnesota

Mower Clerk of Courts, Austin, Minnesota

Personnel from Minnesota Correctional Facility, St. Cloud, Minnesota.

Forensic Laboratory Personnel, Pierre, South Dakota

Pine Clerk of Courts, Pine City, Minnesota

On the day of trial on the Part II information, state sought leave for a late endorsement of the specific names of some of these witnesses. The witnesses were: Spencer Osterburg, a police officer from Albert Lee, Minnesota; Phil VandeWalle, a police detective from Huron, South Dakota; Sam Casper, a police officer for the City of Huron, South Dakota; and, Ron Sjerven, a fingerprint examiner for the South Dakota Forensic Laboratory in Pierre, South Dakota. Leave for late endorsement was granted over Ganrude's objection. Ganrude now asserts allowance of the late endorsement was an abuse of the trial court's discretion.

■ At the outset, we question whether state was required to endorse the names of witnesses on the Part II information in any event. In *State v. Williamson,* 342 N.W.2d 15 (S.D.1983), the defendant was sentenced as an habitual offender with three or more prior felony convictions under SDCL 22–7–8. However, the Part II information only charged him with having one or two prior felony convictions under SDCL 22–7–7. On appeal, the defendant argued that because the Part II information charged a violation of SDCL 22–7–7 and not 22–7–8, the trial court was required to sentence him under 22–7–7. We held:

SDCL 22–7–11 requires that Part II of the habitual information "must state the *times, places* and *specific crimes* alleged to be prior convictions and must be signed by the prosecutor." (Emphasis added.) Although an information on the

principal charge is required to cite the statute which a defendant is alleged to have violated, SDCL 23A–6–4, there is no comparable requirement for a habitual offender information, SDCL 22–7–11.

*Williamson,* 342 N.W.2d at 17.

The same is true with regard to the endorsement of witnesses. Although under SDCL 23A–6–10, an information on the principal charge is required to list the witnesses known to the prosecuting attorney, there is no comparable requirement for a habitual offender information in SDCL 22–7–11.

■ Even if we were to hold that a habitual offender information must contain an endorsement of witnesses, Ganrude has failed to preserve any error in the late endorsement for appeal. "[A] defendant in a criminal case must ask for a continuance when confronted with surprise if he wishes to preserve that point on appeal.... It is incumbent on the defense to present the appropriate motion in order to preserve any error on appeal." *State v. Smith,* 477 N.W.2d 27, 34 (S.D.1991). Here, Ganrude objected but never moved for a continuance when state sought leave for the late endorsement. Moreover, the record reflects Ganrude knew of witness Osterburg on April 3, 1992; witness Sjerven approximately March 5, 1992; and, had access to the information testified to by the remaining two witnesses before Ganrude's principal trial in February 1992. Trial on the Part II information took place on April 15, 1992. Thus, it appears Ganrude had sufficient notice of the evidence to be offered through the belatedly endorsed witnesses to avoid any prejudicial effect from the late endorsement.

Affirmed.

MILLER, C.J., and HENDERSON, WUEST, SABERS and AMUNDSON, JJ., participating.